# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

JOSEPH ZEIGLER,
      Petitioner,

v.                                    Case No. 8:17-cv-286-KKM-TGW

SECRETARY, DEPARTMENT
OF CORRECTIONS,
      Respondent.
_____

## ORDER

    Zeigler, a Florida prisoner, timely[1] filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 challenging his state court conviction based on alleged insufficiency of the evidence, alleged errors of the trial court, and alleged failings of his trial counsel. (Doc. 1.) Having considered the petition, (*id.*), and the response in opposition, (Doc. 28), the

---

[1] A state prisoner has one year from the date his judgment becomes final to file a § 2254 petition. *See* § 2244(d)(1). This one-year limitation period is tolled during the pendency of a properly filed state motion seeking collateral relief. *See* § 2244(d)(2). After affirming the conviction and sentence, the state appellate court denied Zeigler's motion for rehearing on March 18, 2009. (Doc. 28-9, Exs. 4 & 5.) His judgment became final 90 days later, on June 16, 2009, when the time to petition the Supreme Court of the United States for a writ of certiorari expired. *See Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002). After 139 days of untolled time elapsed, Zeigler filed a motion for postconviction relief on November 3, 2009. (Doc. 28-9, Ex. 6, p. 1.) The postconviction motion remained pending until the state appellate court's mandate issued on July 5, 2016. (Doc. 28-10, Ex. 10.) Zeigler filed his § 2254 petition on January 30, 2017, after another 208 days of untolled time. (Doc. 1, p. 14.) A total of 347 days of untolled time elapsed, and Zeigler's petition is therefore timely.

petition is denied.[2] Because reasonable jurists would not disagree, a certificate of appealability also is not warranted.

## I.   BACKGROUND

### A. Procedural Background

A jury convicted Zeigler of one count of murder in the first degree. (Doc. 28-4, Ex. 1f, p. 1267.) The state trial court sentenced him to life in prison. (*Id.*, pp. 1324-1327.) The state appellate court per curiam affirmed Zeigler's conviction and sentence. (Doc. 28-9, Ex. 4.) Zeigler's motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 was denied. (Doc. 28-9, Exs. 6 & 6a; Doc. 28-10, Ex. 6b.) The state appellate court per curiam affirmed the denial of relief. (Doc. 28-10, Ex. 9.)

Before I inherited the case, Zeigler's § 2254 petition was initially dismissed as untimely, but he then filed a motion for a certificate of appealability demonstrating that his petition was timely. (Docs. 16, 19 & 21.) After Zeigler's appeal was dismissed, the Court granted Zeigler's pending motion for relief under Federal Rule of Civil Procedure 60(b), vacated the order dismissing the petition, and obtained a response to the petition. (Doc. 27.)

---

[2] Zeigler did not file a reply.

## B. Factual Background[3]

### 1. Overview

The victim in this case was A.V., a two-year-old girl whose parents were Melissa Marshall and Omar Vasquez. (Doc. 28-6, Ex. 1l, p. 594.) After A.V. was born, Marshall and Vasquez broke up and Marshall began dating Zeigler. (*Id.*, pp. 604, 608.) A.V. died on February 16, 2004, after being alone in Zeigler's care. The State argued that Zeigler abused her that day, causing her death. Zeigler maintained that her fatal head injuries had been inflicted earlier by another caregiver and that other injuries were caused by paramedics who treated her on February 16, 2004.

A hypothetical question posed to the medical examiner on cross-examination explains Zeigler's theory of events. Zeigler suggested that A.V. received a basilar skull fracture in the 72 hours before she went to the hospital on February 8, 2004, when she was vomiting blood. (Doc. 28-7, Ex. 1q, p. 1132.) Under Zeigler's theory, symptoms that she exhibited at that time and until the time of her death, including discharge from her sinus and ear, were consistent with having received the fracture but were not recognized by medical providers. (*Id.*, pp. 1132-33.) Zeigler indicated that A.V. developed a bleeding disorder as a result of the skull fracture and began to bleed from the site of the fracture on February 16, 2004, when Zeigler found her and called 911. (*Id.*, pp. 1133-34.) Zeigler

---

[3] This factual summary is based on the trial transcript.

asserted that paramedics caused additional injuries through their resuscitative efforts. (*Id.*, p. 1134.) And in his closing argument, Zeigler asserted that he accidentally bit A.V.'s cheek while attempting to provide mouth-to-mouth resuscitation. (Doc. 28-8, Ex. 1w, p. 1891.)

## 2. Events Prior To A.V.'s Death

Marshall attended a high school with a daycare program for A.V. (Doc. 28-6, Ex. 1l, pp. 594, 600.) Marshall and A.V. lived in an apartment with Marshall's grandmother, Peggy Teuton, in Sarasota, Florida. (*Id.*, pp. 592, 612.) Other caregivers included Marshall's mother, Vasquez's mother Juana Kennedy, and a family friend named Kim Gill. (*Id.*, pp. 602-03, 606-07.) According to Kennedy, Vasquez was very strict and would get mad with A.V. (Doc. 28-6, Ex. 1m, pp. 766, 768.) Starting in about November 2003, Marshall noticed changes in Vasquez's behavior and preferred that he not be alone with A.V. for long periods of time. (*Id.*, pp. 689-92.)

A.V. stayed at Kennedy's home from Friday to Sunday the weekend of February 6–8, 2004. (Doc. 28-6, Ex. 1l, pp. 625-26.) In addition to Kennedy and Vasquez, others who were present at the home were Kennedy's boyfriend, Armando, and her other son, Pablo. (Doc. 28-6, Ex. 1m, p. 748.) Kennedy stated that A.V. was not hurt at her home that weekend and that she did not leave A.V. in anyone else's care that weekend. (*Id.*, pp. 751-52.) But she acknowledged that at some point that weekend, A.V. was with Vasquez for a period of time and was also with Pablo for a time. (*Id.*, pp. 782-85.)

On Sunday, February 8, 2004, Zeigler went by himself to pick up A.V. (Doc. 28-6, Ex. 1l, pp. 626-27.) On the way back, he called Marshall to say that A.V. looked sick. (*Id.*, p. 629.) Marshall called Kennedy, who stated that it seemed like A.V.'s ear had been bothering her, so she had given A.V. Tylenol. (*Id.*) Zeigler then called Marshall back to say that A.V. was throwing up blood. (*Id.*, p. 630.) When Zeigler brought A.V. home, Marshall observed that she was not responding well and could barely keep her eyes open. (*Id.*, p. 631; Doc. 28-6, Ex. 1m, p. 707.)

A.V. was taken to an emergency room. (Doc. 28-7, Ex. 1r, pp. 1285-86.) Dr. Nicholas Angelastro observed petechiae, which he described as "the smallest of the small bruises . . . due to capillary membranes rupturing" around her neck and face. (*Id.*, pp. 1288, 1293.) He believed the petechiae were attributable to vomiting. (*Id.*, pp. 1294-96.) He likewise thought that dried blood in her right nostril could be attributed to vomiting. (*Id.*, pp. 1295.) Dr. Angelastro noted an inner ear infection in A.V.'s right ear. (*Id.*, p. 1289.) Dr. Angelastro believed it was "less than likely" that A.V. had a significant injury the night he saw her. (Doc. 28-7, Ex. 1r, p. 1325.) He thought her condition was due to an infection and that she might have pneumonia. (*Id.*, pp. 1295, 1297.) But he conceded that "anything is possible" in medicine and that it was possible she was injured by a caregiver and suffered a basilar skull fracture. (*Id.*, p. 1325-26.) Dr. Angelastro also agreed that basilar skull

5

fractures can be difficult to diagnose and that one possible complication is the leakage of cerebrospinal fluid. (Doc. 28-7, Ex. 1r, pp. 1320, 1322.)

The next two days, Monday and Tuesday, February 9–10, 2004, A.V. had a fever and stayed home from daycare with Marshall. (Doc. 28-6, Ex. 1l, pp. 633-36.) On Wednesday, Marshall went to school and A.V. went to daycare. (*Id.*, pp. 637-38.) Kim Gill picked up A.V. from daycare and watched her overnight. (*Id.*, pp. 638-39.) A.V. did not vomit or bleed that night. (Doc. 28-6, Ex. 1n, p. 837.) But the next day, February 12, 2004, at Gill's urging, Marshall took A.V. to her pediatrician, Dr. Richard Perez, for a runny nose. (*Id.*, p. 838; Doc. 28-6, Ex. 1l, p. 639.)

Dr. Perez saw some bloody drainage from A.V.'s right ear and found that she had a severe ear infection. (Doc. 28-8, Ex. 1t, pp. 1393, 1403.) A.V.'s head felt normal and he did not notice any bruises, petechiae, fluid or blood from her nose, blackness under her eyes, or any indication of a basilar skull fracture. (*Id.*, pp. 1405-07, 1412, 1416-18.)

The next day, Friday, February 13, 2004, Marshall and A.V. went to school and daycare, where A.V. appeared to be fine at a Valentine's Day party. (Doc. 28-6, Ex. 1l, p. 641.) Kennedy picked up A.V. from daycare later that morning and watched her over the weekend. (Doc. 28-6, Ex. 1m, pp. 651-52.) When Kennedy gave her a bath, she did not notice anything unusual about A.V.'s head, face, or neck. (*Id.*, p. 759.)

Kennedy brought A.V. back to Marshall's apartment at approximately 1:00 p.m. on Monday, February 16, 2004. (*Id.*, p. 655.) Zeigler was also there, watching television. (*Id.*, p. 653.) A.V. looked a little sleepy or sick and wanted to be held, but Marshall did not see any injuries on her. (*Id.*, pp. 657, 715-16.) Marshall sat with A.V. and rubbed her head. (Doc. 28-6, Ex. 1l, p. 659.) She did not notice anything unusual. (*Id.*) At about 2:00 p.m., A.V. took a nap in Teuton's bed. (*Id.*, pp. 660, 666.)

At about 3:45 to 3:50 p.m., Marshall opened the bedroom door to look at A.V., who was still asleep, before leaving to pick up Marshall's younger sister. (*Id.*, p. 668.) Zeigler stayed at the apartment with A.V. (*Id.*) Marshall had only been gone about seven or eight minutes when Zeigler called her, saying that A.V. was throwing up and to come home. (*Id.*, pp. 669-70.) Marshall later realized she had two voicemails from Zeigler stating that A.V. was throwing up and bleeding and that she needed to hurry back. (*Id.*, pp. 728-30.) Zeigler called 911 and stated that he had a sick baby. (Doc. 28-7, Ex. r, p. 1270.) While he waited for paramedics, Zeigler began CPR and chest compressions per the 911 operator's instructions. (Doc. 28-6, Ex. 1m, p. 670.)

When firefighter Robert Rademan arrived, A.V. was not breathing, had no pulse, had a bruise that looked like a bite mark on her cheek, had "raccoon eyes," and had blood on her nose and in her ear canals. (Doc. 28-7, Ex. 1o, pp. 913, 918-22.) He also felt crepitus on the back of her skull, which he described as having a "gritty sand" feeling. (*Id.*, p. 920.)

The "raccoon eyes" and crepitus signaled to him that A.V. had suffered head trauma and a basilar skull fracture. (*Id.*, pp. 918-20, 923.)

Paramedics put a C-collar on A.V.'s neck, inserted an endotracheal tube in her throat, and administered CPR. (*Id.*, pp. 918, 926-27, 934-35, 982-83.) She was transported to a hospital via helicopter. (*Id.*, p. 941.) On the flight, paramedics re-intubated A.V. with a smaller tube. (Doc. 28-8, Ex. 1t, pp. 1452-53, 1518.) Keith Peterson, the paramedic who did so, could see her airway clearly and stated he did not injure her throat or vocal cords. (*Id.*, p. 1522.)

Dr. Michael Mazzaferro, an emergency room doctor who saw A.V., felt a "boggy" area on the back of her head. (Doc. 28-7, Ex. 1s, p. 1350.) He described the term "boggy" as "feel[ing] somewhat like a wet sponge" and stated that it is typically indicative of an injury. (*Id.*) He testified that her skull fracture was severe and a person who suffered this type of fracture would not act normally. (*Id.*, p. 1358.) Dr. Mazzaferro did not see any injuries he believed to be caused by medical intervention. (*Id.*, pp. 1351-52.) Additionally, nothing about A.V.'s injuries indicated that they were inflicted eight days earlier. (*Id.*, p. 1353.) Dr. Mazzaferro pronounced A.V. dead at 5:02 p.m. (*Id.*, p. 1352.) When Marshall later saw A.V.'s body, she observed injuries on A.V.'s neck, bruising on her ears, and a mark on her cheek. (Doc. 28-6, Ex. 1m, p. 672.) Marshall did not see those injuries when she left A.V. with Zeigler that afternoon. (*Id.*, pp. 672-73.)

8

### 3. Other Medical Evidence

Dr. Susan Ignacio, an assistant medical examiner, performed A.V.'s autopsy. (Doc. 28-7, Ex. 1q, pp. 1219-20.) Dr. Jon Thogmartin, the medical examiner, was present. (Doc. 28-7, Ex. 1p, pp. 1049-50, 1067.) Dr. Ignacio testified that A.V.'s injuries were severe and would have led to an immediate loss of consciousness. (*Id.*, pp. 1232-33.)

Dr. Thogmartin observed an extremely large scalp hemorrhage. (*Id.*, pp. 1097, 1099.) Dr. Thogmartin indicated that this condition demonstrated "a global, multiple, blunt force impact case." (*Id.*, p. 1096.) He testified that nothing about the blood indicated it was days old, and that the injuries causing it occurred "right around the time of her death." (*Id.*, p. 1099.) Dr. Thogmartin stated that A.V. had two skull fractures in her occipital bone, in the basilar region of her skull. (*Id.*, pp. 1102-04.)

Dr. Thogmartin noted four areas of contusions and abrasions on one side of A.V.'s neck, and another area on the other side, suggesting that this injury was caused by a human hand. (*Id.*, p. 1086.) He also found hemorrhages to A.V.'s neck muscles showing a compressive or blunt force trauma and inconsistent with having been caused by a C-collar. (*Id.*, pp. 1108-09.) Dr. Thogmartin noted petechiae on her face, neck, eyes, and upper chest. (*Id.*, pp. 1074, 1081, 1083.) He agreed with Dr. Ignacio's conclusion that the cause of death was blunt head trauma with a contributory condition of strangulation, and that the manner was homicide. (*Id.*, p. 1114; Doc. 28-7, Ex. 1q, p. 1225.)

Dr. Thogmartin testified that injuries to A.V.'s tongue in theory could have come from an endotracheal tube but were likely from her biting her tongue. (*Id.*, pp. 1109-12.) Dr. Thogmartin did not believe that A.V. suffered from a bleeding disorder because she did not have other signs of that condition, such as bleeding elsewhere inside her body. (Doc. 28-7, Ex. 1q, p. 1163-64, 1213-15.) And while Dr. Thogmartin appeared to agree that petechiae observed at the emergency room on February 8, 2004, could be evidence of a bleeding disorder, he believed that they were "much more likely" due to "a previous episode of strangulation." (*Id.*, pp. 1173-74.)

Dr. Thogmartin conceded that if the petechiae observed on February 8 were not related to strangulation, that would call his conclusions into doubt. (*Id.*, p. 1177.) Dr. Thogmartin agreed that a bleeding disorder can be a common complication of blunt force head trauma. (*Id.*, p. 1216.) Dr. Thogmartin stated that a person who suffers a basilar skull fracture can leak cerebrospinal fluid. (Doc. 28-7, Ex. 1q, p. 1138.) Dr. Ignacio similarly testified that, depending on its location, a basilar skull fracture may allow cerebrospinal fluid to leak and that it can be possible for people to function after experiencing a basilar skull fracture. (*Id.*, p. 1230-31.)

Stephen Nelson, a forensic pathologist with a specialty in neuropathology, examined A.V.'s brain. (Doc. 28-8, Ex. 1v, pp. 1590, 1603.) Dr. Nelson had no doubt that A.V.'s injuries were fresh. (*Id.*, p. 1615.) He explained that there was no change in the color of

the blood or evidence of certain conditions that would have developed had the injuries been days old. (*Id.*, pp. 1615-17, 1672.)

Of importance to the defense was Dr. Nelson's testimony about the presence of reactive astrocytes in A.V.'s brain. Dr. Nelson stated that astrocytes are cells that support and nourish the brain's neurons. (*Id.*, p. 1597.) Astrocytes become reactive in response to an emergency and "a period of time for that to happen" is required. (*Id.*, pp. 1620-22.) Dr. Nelson found reactive astrocytes that he thought were activated by A.V.'s traumatic head injury. (*Id.*, pp. 1619-20.)  Counsel presented Dr. Nelson with a medical text stating that astrocytes showing reactive changes may begin appearing five days after an injury. (*Id.*, pp. 1668.) But Dr. Nelson stated that the injuries could not be dated based solely on cellular changes to the astrocytes, and stated that "the literature . . . is pretty much over the gamut saying that some people can see it after an hour or so." (*Id.*, pp. 1620, 1660-61.)

Dr. Nelson also agreed that drainage from the nose or ear might be a symptom of a basilar skull fracture, depending on the fracture's location. (*Id.*, pp. 1636-37.) He stated that people can develop bleeding disorders as a result of suffering a head injury, and that this development is common in children when there is a period of survival after the injury. (*Id.*, pp. 1641-42.)

Barry Edward Lipton, a forensic dentist, testified that he received photographs of the injury on A.V.'s right cheek. (Doc. 28-7, Ex. 1o, pp. 870-71.) Dr. Lipton took dental

impressions from Zeigler. (*Id.*, p. 881.) He used computer-generated overlays to compare Zeigler's dental impressions with a photograph of the bite mark. (*Id.*, pp. 886-93.) In Dr. Lipton's professional opinion, Zeigler "could not be excluded and was the probable, more likely than not, cause of the bite mark." (*Id.*, p. 895.) Dr. Lipton believed that the bite mark was inflicted "around the time of death." (*Id.*, p. 880.)

## II.   STANDARD OF REVIEW UNDER SECTION 2254

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief under the AEDPA can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "The power of the federal courts to grant a writ of habeas corpus setting aside a state prisoner's conviction on a claim that his conviction was obtained in violation of the United States Constitution is strictly circumscribed." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1093 (11th Cir. 2022).

Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), the phrase "clearly established Federal law" encompasses the holdings only of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This section "defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court." *Id.* at 404. First, a decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413.

Second, a decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694. As a result, to obtain relief under the AEDPA, "a state prisoner must show that the state court's ruling

on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that "[t]he state court's application of clearly established federal law must be objectively unreasonable" for a federal habeas petitioner to prevail and that the state court's "clear error" is insufficient).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). But the habeas court is "not limited by the particular justifications the state court provided for its reasons, and [it] may consider additional rationales that support the state court's determination." *Jennings v. Secretary, Fla. Dep't of Corr.*, 55 F.4th 1277, 1292 (11th Cir. 2022). When the relevant state-court decision is not accompanied with reasons for the decision—such as a summary affirmance without discussion—the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192. The state may "rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Id.*

For purposes of § 2254(d)(2), "it is not enough to show that 'reasonable minds reviewing the record might disagree about the finding in question.' " *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) (quotations omitted). "An unreasonable determination of the facts occurs when the direction of the evidence, viewed cumulatively, was too powerful to conclude anything but the petitioners factual claim." *Teasley v. Warden, Macon State Prison*, 978 F.3d 1349, 1355 (11th Cir. 2020) (internal quotation marks and alterations omitted). A state court's findings of fact are presumed correct, and a petitioner can rebut the presumption of correctness afforded to a state court's factual findings only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Even where a petitioner succeeds in rebutting the presumption, he must show that the state court's decision is "based on" the incorrect factual determination. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022). This is because a state court decision may still be reasonable "even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination." *Id.* (quoting *Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1224–25 (11th Cir. 2021) (Newsom, J., concurring)).

In addition to satisfying the deferential standard of federal court review of a state court adjudication, a federal habeas petitioner must exhaust his claims by raising them in

state court before presenting them in a federal petition. *See* 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). A petitioner satisfies this exhaustion requirement if he fairly presents the claim in each appropriate state court and alerts that court to the federal nature of the claim. *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A petitioner shows cause for a procedural default when he demonstrates "that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). "A 'fundamental miscarriage of justice' occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Id.*

16

## III.   INEFFECTIVE ASSISTANCE OF COUNSEL

Zeigler brings claims for ineffective assistance of trial counsel under the Sixth Amendment. Under the well-known, two-part standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed, he must show both deficient performance by his counsel and prejudice resulting from those errors. *Id.* at 687.

The first part "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The lynchpin of this analysis is whether counsel's conduct "was reasonable considering all the circumstances." *Id.* at 688. A petitioner establishes deficient performance if "the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. A court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

The second part requires showing that the deficient performance prejudiced the defense. *Id.* at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.' " *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Consequently, federal petitioners rarely prevail on claims of ineffective assistance of counsel because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation and citations omitted).

## IV. ANALYSIS

### A. Ground One

Zeigler argues that the state court erred in denying his motion for judgment of acquittal because the State's evidence was insufficient to prove his guilt. As an initial matter, Zeigler does not clearly raise a federal claim in Ground One. He contends that the state court's decision was contrary to Supreme Court precedent, but does not identify this precedent or claim that his federal rights were violated. (Doc. 1, pp. 4-5.) Thus, the claim is not cognizable on federal habeas review. *See Branan v. Booth*, 861 F.2d 1507, 1508

(11th Cir. 1988) ("[A] habeas petition grounded on issues of state law provides no basis for habeas relief.").

Even if the § 2254 claim is liberally construed as alleging a federal due process violation, *see Jackson v. Virginia*, 443 U.S. 307 (1979), it is procedurally defaulted. Ziegler's appellate brief relied on Florida's unique standard of review for circumstantial evidence cases. (Doc. 28-9, Ex. 2, pp. 36-44.) He never cited the Supreme Court precedent, the Constitution, or otherwise notified the state court that he brought a federal due process challenge. Florida's standard that governed at the time was markedly different too, providing that "[w]here the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence." *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 460 (11th Cir. 2015) (quoting *Thorp v. State*, 777 So.2d 385, 389 (Fla. 2000)). Florida's standard for circumstantial evidence thus "differs greatly" from the federal standard of review. *Preston*, 785 F.3d at 460.[4] The federal standard, articulated in *Jackson*, asks whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. 443 U.S. at 319.

---

[4] Florida has eliminated its distinct standard of review in circumstantial evidence cases. *Bush v. State*, 295 So.3d 179 (Fla. 2020). However, the circumstantial evidence standard was in effect at the time of Zeigler's trial and direct appeal.

Therefore, Zeigler did not fairly present a federal sufficiency of the evidence claim to the state appellate court.  Zeigler cannot return to state court to present the federal claim in a second direct appeal. *See* Fla. R. App. P. 9.140(b)(3) (stating that a notice of appeal must be filed within 30 days of the rendition of sentence). Despite this failure, the claim is technically exhausted. State-court remedies are exhausted "when they are no longer available, regardless of the reason for the unavailability." *Shinn v. Ramirez*, 142 S.Ct. 1718, 1732 (2022) (quoting *Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006)). But any federal due process claim is procedurally defaulted because it was "not presented to the state courts 'consistent with [the State's] own procedural rules' " requiring the claim to be brought on direct appeal. *Ramirez*, 142 S.Ct. at 1732 (quoting *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000)). Zeigler does not show that an exception applies to overcome the default. *See id.* Accordingly, the claim raised in Ground One is barred from federal habeas review.

## B. Ground Two

Zeigler contends that the state court erred by limiting his cross-examination of Melissa Marshall and Peggy Teuton. Zeigler has not clearly presented a federal claim. Similar to his argument in Ground One, he contends that the state court's denial of his claim was contrary to Supreme Court precedent, but does not identify any such decision, cite federal authority, or assert that his federal rights were violated. (Doc. 1, p. 6.) Therefore, the claim raised in Ground Two is not cognizable in this § 2254 action. *See*

*Branan*, 861 F.2d at 1508. Even assuming that Zeigler's claim can be construed as raising a challenge under the Sixth Amendment's Confrontation Clause and that his presentation of the claim on direct appeal was sufficient to exhaust its federal nature, Zeigler is not entitled to relief for the following reasons.

### 1. Cross-Examination of Melissa Marshall

The trial court granted the State's motion to exclude evidence about Marshall's mental health. Before trial, the State explained that Marshall suffered from depression for a time and took anti-depressant medications. (Doc. 28-6, Ex. 1k, pp. 524-25.) The State also told the trial court that Marshall was committed under the Baker Act[5] about 11 months before A.V.'s death. (*Id.*, p. 525.) Zeigler asserted that after Marshall went off her medication, she relapsed and began taking Kim Gill's medication. (*Id.*, pp. 526-27.)[6] Zeigler maintained that such matters "very well may have affected [Marshall's] ability to perceive events, recall events, and later recount those events in the courtroom." (*Id.*, p. 527.) But Zeigler agreed that he could not present testimony that experiencing depression and starting and stopping medication would in any way affect Marshall's ability to care for A.V. or her ability to observe. (*Id.*, pp. 530-31.) The state trial court granted the State's motion

---

[5] *See* §§ 394.451 & 394.467, Fla. Stat. (stating that the Baker Act provides for involuntary inpatient placement under certain circumstances).

[6] Marshall later gave proffered testimony consistent with the information presented by the State and Zeigler. (Doc. 28-6, Ex. 1m, pp. 737-40.)

to exclude this evidence. The state trial court found that the evidence was not relevant because it did not concern Marshall's ability to care for and observe A.V. (*Id.*, p. 531.)

While the Sixth Amendment's Confrontation Clause allows a criminal defendant to confront the witnesses against him, cross-examination is not unlimited. "[T]he accused is 'entitled only to an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defendant might wish.' " *United States v. Barber*, 769 F. App'x 728, 733 (11th Cir. 2019) (quoting *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1366 (11th 1994)). "A defendant's confrontation rights are satisfied when the cross-examination permitted exposes the jury to facts sufficient to evaluate the credibility of the witness and enables defense counsel to establish a record from which he properly can argue why the witness is less than reliable." *United States v. Allmond*, 817 F. App'x 887, 893 (11th Cir. 2020) (quoting *Baptista-Rodriguez*, 17 F.3d at 1371). "The test for the Confrontation Clause is whether a reasonable jury would have received a significantly different impression of the witness's credibility had counsel pursued the proposed line of cross-examination." *Allmond*, 817 F. App'x at 893 (quoting *United States v. Taylor*, 17 F.3d 333, 340 (11th Cir. 1994)).

Once the cross-examination satisfies the Confrontation Clause, "further questioning is within the [trial] court's discretion." *Allmond*, 817 F. App'x at 893 (citing *Taylor*, 17 F.3d at 340). "A defendant can only cross-examine a prosecution witness if the

information sought to be elicited [is] relevant." *United States v. Khan*, 794 F.3d 1288, 1301 (11th Cir. 2015); *see Barber*, 769 F. App'x at 733 (stating that a trial court has discretion to impose limits on cross-examination based on concerns of "confusion of the issues or interrogation that is 'only marginally relevant.' " (quoting *Baptista-Rodriguez*, 17 F.3d at 1366)).

Zeigler does not establish that the evidence about Marshall's mental health and medication history showed an effect on her ability to care for A.V. or her ability to recall and testify to relevant events. Indeed, when the state trial court asked whether there was going to be evidence that taking and stopping medication, as well as going through depression, would "in any way affect [Marshall's] ability to either properly care for the child and/or to observe," defense counsel responded, "I don't believe we have a witness that would specifically testify to that, Your Honor." (Doc. 28-6, Ex. 1l, pp. 530-31.) Nor did counsel indicate to the state trial court that he had any evidence that Marshall's ability to recall events was affected by her mental health and medication usage. (*Id.*) Therefore, Zeigler has not shown any connection between this evidence and how A.V. was injured or whether Marshall's testimony was accurate. Accordingly, he does not show that the evidence was relevant. *See* § 90.401, Fla. Stat. (stating that relevant evidence "is evidence tending to prove or disprove a material fact"). And to the extent this mental health evidence might have gone to the reasons why A.V. spent time with different caretakers, Zeigler

likewise fails to show that an explanation for the involvement of multiple caretakers was relevant. Moreover, to the extent that the limitation on his cross-examination of Marshall was based on the state court's determination that the evidence he sought to elicit was not relevant under Florida law, this Court must defer to the state court's application of state law regarding what evidence would be permitted as relevant. *See Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985) ("The federal courts must defer to a state court's interpretation of its own rules of evidence and procedure.").

Further, Zeigler does not establish that the limitation on cross-examination prevented the jury from obtaining a significantly different view of Marshall's credibility. First, as addressed, Zeigler acknowledged that he was unable to show a connection between Marshall's mental health and medication usage and her ability to care for A.V. or her ability to observe and gave no indication that he could show it affected Marshall's ability to recall. In addition, counsel undertook a lengthy cross-examination of Marshall that covered matters such as her relationships with Zeigler, Vasquez, Gill, and other family members; her hesitation about leaving A.V. alone with Omar Vasquez; Zeigler's relationship and interactions with A.V.; and events from February 8 to February 16, 2004, including A.V.'s numerous medical visits, a detailed accounting of A.V.'s behavior and activity on the afternoon of February 16, 2004, and the voicemails she received from Zeigler that day. (Doc. 28-6, Ex. 1m, pp. 678-731.) Any suggestion that Marshall's mental health concerns

affected her credibility was speculative, and Zeigler conceded that he could not come forward with evidence to show that it affected her actions or observation. (Doc. 28-6, Ex. 1l, pp. 530-31.) Nor did he indicate that any evidence showed her ability to recall the events was impacted by her mental health and use of medication. (*Id.*) Zeigler does not establish that the limitation on his cross-examination of Marshall violated his rights under the Confrontation Clause.

Accordingly, Ziegler does not show that the state court's denial of his claim was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable factual determination. He is not entitled to relief on Ground Two, Subclaim One.

### 2. Cross-Examination of Peggy Teuton

Peggy Teuton, A.V.'s great-grandmother and Marshall's grandmother, testified for the State. Teuton was present when A.V. was taken to the emergency room on February 8, 2004, the day Zeigler reported that she was vomiting blood after he picked her up from the Vasquez/Kennedy residence. (Doc. 28-6, Ex. 1n, pp. 806-08.) On cross-examination, the State objected to defense counsel's question asking whether Teuton heard Marshall tell hospital personnel to smell the victim's shirt. (*Id.*, p. 825.)

Counsel asserted that this information was relevant, and was not impermissible hearsay, because it went to showing that hospital personnel did not take Marshall seriously

and were confused about A.V.'s condition. (*Id.*, pp. 826-27.) The trial court sustained the objection, concluding that it was not relevant and was hearsay. (*Id.*, p. 827.)

The trial court allowed Zeigler to elicit Teuton's proffered testimony outside of the jury's presence to preserve the record. Teuton testified that when Marshall asked a medical provider to smell A.V.'s shirt because it smelled like blood, the individual smelled the shirt, said it was not blood, and said that the victim's mother did not know what blood smelled like. (*Id.*, pp. 829-30.)

Zeigler does not show that the proposed testimony was relevant. It does not establish that medical personnel did not take the visit or Marshall's concerns seriously. The testimony shows that the medical provider smelled the shirt at Marshall's request, and believed that the shirt did not smell like blood. Further, counsel was permitted to cross-examine Teuton about her observations of Zeigler's positive interactions with A.V., and her knowledge of the significant time A.V. spent with Kim Gill. (*Id.*, pp. 815-21.) Finally, to the extent that the trial court's ruling was based on a determination that the statement was both irrelevant and impermissible hearsay under Florida's evidentiary law, this Court must defer to the state court's interpretation of state law. *See Machin*, 758 F.2d at 1433.

Zeigler does not establish that the state court violated his rights under the Confrontation Clause by limiting his cross-examination of Peggy Teuton by excluding the question about Marshall's hearsay at the hospital. He does not show that the state court's

26

denial of his claim was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable factual determination. Zeigler is not entitled to relief on Ground Two, Subclaim Two.

## C. Ground Three

In Ground Three, Zeigler argues that his trial counsel was ineffective.

### 1. Failure to Convey Plea Offers

Zeigler argues that trial counsel was ineffective for failing to convey favorable plea offers to him. He contends that the State made an offer for a 10-year sentence, and also made an offer for a Youthful Offender[7] sentence. Zeigler states that trial counsel never relayed these offers to him. Zeigler provides nearly-identical affidavits from three of his family members stating that defense counsel informed them that the State offered Zeigler 10 years in prison if he pleaded to a lesser-included offense, and that counsel later told them that the State was offering a Youthful Offender sentence in exchange for his plea to a lesser-included offense (Doc. 1, pp. 16-23.) The affidavits also state that the family members insisted "there would be no plea offers" because Zeigler was innocent and that counsel therefore failed to convey the plea offers to Zeigler. (*Id.*)

---

[7] Some individuals who commit a felony before their 21st birthday may qualify for Youthful Offender sentencing. § 958.04(1), Fla. Stat. The maximum prison term permissible under the Youthful Offender Act is six years. § 958.04(2)(d), Fla. Stat.

The state court held an evidentiary hearing on this claim. Zeigler testified that counsel did not advise him of any plea negotiations or plea offers. (Doc. 28-9, Ex. 6a, p. 235.) His aunt, Shirley Zeigler, testified that she was certain counsel told her the State had offered a 10-year plea deal. (*Id.*, pp. 224-25.) She stated that Zeigler did not know about the plea offer until the family brought it up to him while visiting him in prison after his conviction. (*Id.*, pp. 226-28.)

Trial counsel testified that he had no recollection of any plea offers in this case. (*Id.*, pp. 192, 214-15.) Counsel did not believe he ever said "anything like" the State had offered a plea deal for 10 years or for a Youthful Offender sentence. (Id., pp. 215-16.) Counsel testified that he is aware he must communicate any and all plea offers to his client regardless of whether he recommends that the client accept an offer. (*Id.*, p. 215.)

Three individuals who worked on Zeigler's case at the Office of the State Attorney testified. Two former prosecutors who were involved before trial testified that no deals were offered. The first former prosecutor, Debra Johnes Riva, left the Office of the State Attorney when she became a state court judge. (*Id.*, p. 255.) Judge Riva testified that she was the chief homicide prosecutor. (*Id*, p. 256.) Judge Riva testified that ordinarily, after an indictment, her office did not engage in plea negotiations unless "something drastically changes." (*Id.*, p. 258.) She also testified that it was her practice to discuss plea offers with

the victim's next of kin. (*Id.*, p. 259.) Judge Riva testified that she did not ever make a plea

offer for 10 years or for a Youthful Offender sentence. (*Id.*)

The second former prosecutor, Donna Padar Berlin, also left the Office of the State

Attorney upon becoming a state court judge. (*Id.*, pp. 271-72.) Judge Berlin believed that

she was involved in the case from the beginning, and testified that she did not tender any

plea offers in this case and that she did not recall any plea negotiations with counsel. (*Id.*,

p. 273-74.) One of the prosecutors who represented the State at trial, Dawn Buff, testified

that she would had to have received authority from a division chief to offer anything less

than life in prison, that there was never a plea offer to a lesser-included offense, and that

there was never an offer for a 10-year sentence. (*Id.*, pp. 269-70.) Finally, Marshall testified

that she was not in favor of a plea offer and that neither Judge Riva nor Judge Berlin

communicated to her any intent to offer Zeigler a 10-year plea deal. (*Id.*, pp. 265-66.)

The state court denied Zeigler's claim, finding that "[t]he State made no plea offers

in this case." (Doc. 28-10, Ex. 6b, p. 289.) This is a factual finding that is entitled to a

presumption of correctness on federal habeas review. 28 U.S.C. § 2254(e)(1). The state

court based its decision on the testimony outlined above. (*Id.*, pp. 289-90.) To the extent

the state court's finding that no pleas were offered was based on an implicit determination

that the prosecutor, former prosecutors, defense counsel, and Marshall were credible, that

credibility finding is likewise a determination of fact that is presumed correct. *See Rolling*

*v. Crosby*, 438 F.3d 1296, 1301 (11th Cir. 2006) ("The factual findings of the state court, including the credibility findings, are presumed to be correct unless [the petitioner] rebuts the presumption by clear and convincing evidence." (citing 28 U.S.C. § 2254(e)(1)).

Zeigler does not rebut, by clear and convincing evidence, the presumption of correctness afforded to the state court's factual findings. The finding that no plea offers were made is supported by the evidentiary hearing testimony. Counsel could not be deficient for failing to inform Zeigler of plea offers when no such offers were made. Zeigler fails to show that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim. He is not entitled to relief on Ground Three, Subclaim One.

### 2. Misadvice Not to Testify

Zeigler argues that trial counsel was ineffective for misadvising him not to testify. At the evidentiary hearing, Zeigler stated that he would have testified that he found A.V. on the floor and believed that she was hurt when she fell off the bed where she was napping and hit a dresser drawer. (Doc. 28-9, Ex. 6a, pp. 244-46.) He stated that he would have described calling Marshall and 911 and how he attempted to perform CPR on A.V. (*Id.*, pp. 246-50.) He stated that he would have testified that he accidentally hit A.V.'s cheek. (*Id.*, pp. 249-50.) Zeigler testified that he told counsel he wanted to testify, but that he did

not testify because counsel was not comfortable with him doing so and did not believe he was capable of telling the jury his version of events. (*Id.*, pp. 236-37, 240-41.)

Trial counsel testified that he advised against Zeigler's testifying. Counsel was not aware of any information that could be used to impeach Zeigler. (*Id.*, p. 195.) But counsel stated that he believed that certain medical evidence was exculpatory, and that Zeigler could not add anything to the medical testimony. (*Id.*, pp. 193-94.) Counsel testified that he was "probably not confident" that Zeigler could answer questions about the injuries. (*Id.*, p. 197.) Counsel also testified that Zeigler had a low IQ and that he was concerned that Zeigler was not a good communicator. (*Id.*, pp. 195-96.) He believed that Zeigler might not effectively convey his testimony to the jury and that Zeigler might become confused when faced with difficult cross-examination by experienced prosecutors. (*Id.*, pp. 196-97.) Counsel testified that he had "considerable" contact with Zeigler throughout his representation. (*Id.*, p. 198.) Counsel testified that since trying Zeigler's case, he had changed his approach to deciding whether to advise clients to testify, and that at the time of the evidentiary hearing, he believed that Zeigler should have testified. (*Id.*, p. 199.)

The state court denied Zeigler's claim. The state court found, based on counsel's testimony at the evidentiary hearing, that counsel was not ineffective for advising Zeigler not to testify at trial. (Doc. 28-10, Ex. 6b, pp. 290-91.) The state court found that it could

not conclude, based on the record before it, that no reasonable attorney would have discouraged the defendant from testifying. (*Id.*, p. 291.)

Zeigler fails to show that the state court unreasonably denied his claim. "Defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide." *United States v. Teague*, 953 F.2d 1525, 1533 (11th Cir. 1992). Counsel had concerns that Zeigler would not be able to communicate to the jury and that, although counsel was not aware of information that could be used to impeach Zeigler, he would not fare well on cross-examination.

Considering these doubts, and in the light of Zeigler's lack of knowledge about the medical testimony that counsel believed was important to the defense, Zeigler cannot show that the state court unreasonably determined counsel was effective. *See Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) ("[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take."); *cf. Lukeheart v. Sec'y, Fla. Dep't of Corr.*, 50 F.4th 32, 47 (11th Cir. 2022) (stating in the context of deciding whether to call a witness that "[i]t 'is reasonable—and not ineffective—for trial counsel to eliminate certain lines of presentation if he has misgivings

about hurtful cross-examination . . . .' " (quoting *Ward v. Hall*, 592 F.3d 1144, 1164 (11th Cir. 2010))).

Although counsel subsequently changed his views about advising clients whether to testify, this shift in his practice does not establish that he was ineffective at the time he advised Zeigler. *See, e.g.*, *Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). And here, counsel stated that his testimony was based not only on his changed viewpoint but was "certainly . . . also a result of the outcome in the case as well." (Doc. 28-9, Ex. 6a, p. 199.)

Zeigler does not show that counsel's performance was deficient under *Strickland*. Further, in the light of the State's overall evidence of guilt, Zeigler does not show a reasonable probability of a different outcome at trial had he testified, even if his testimony aligned with some of the medical evidence. Zeigler fails to show that the state court unreasonably applied *Strickland* or based its decision on an unreasonable factual determination. He is not entitled to relief on Ground Three, Subclaim Two.

### 3. Failure to Move for a Mistrial

Zeigler argues that trial counsel was ineffective for failing to object and move for a mistrial based upon the State's "improper inflammatory comments and mischaracterization

of Defendant" during opening statements. (Doc. 1, p. 8.) The prosecutor addressed what she believed the evidence would show about A.V.'s injuries and commented on the bite mark found on her cheek:

> One of those injuries that you will hear about is that bite mark to the cheek. You will hear evidence that it's a bite mark that's consistent with the Defendant's bite, not with the other people who were around, not consistent with Omar, not consistent with Melissa. It's the Defendant's bite mark. His very own signature left at the scene of the crime.

(Doc. 28-6, Ex. 1l, p. 578.)

Zeigler argues that statement about his "signature" was inflammatory. The state court denied Zeigler's ineffective assistance claim, finding that the statement was made "in the context of explaining what the prosecutor expected to show through evidence that would be introduced during the trial." (Doc. 28-9, Ex. 6, p. 124.) The state court concluded that, "much like a fingerprint, the bite mark was a 'signature' linked to the Defendant" and that the remark "noted the point succinctly." (*Id.*) Therefore, the state court found, counsel was not ineffective for failing to object and move for a mistrial. (*Id.*)

Zeigler does not show that the state court's decision was unreasonable. Opening statements set out what the attorneys expect the evidence will show. *See United States v. Lizon-Barias*, 252 F. App'x 976, 978 (11th Cir. 2007) ("An opening statement gives

34

counsel the opportunity to state what evidence will be presented in order to make it easier for the jurors to understand what is to follow, and is not an occasion for argument.").

While a prosecutor must refrain from appealing to the jury's "passion or prejudice," *see United States v. Rodriguez*, 765 F.2d 1546, 1560 (11th Cir. 1985), Zeigler does not establish that the prosecutor's comments were improper. "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks and citations omitted). A defendant's substantial rights "are prejudicially affected [by improper prosecutorial comments] when a reasonable probability arises that, but for the remarks, the outcome [of the trial] would have been different." *United States v. Hall*, 47 F.3d 1091, 1098 (11th Cir. 1995) (citing *Kennedy v. Dugger*, 933 F.2d 905, 914 (11th Cir. 1991)).

The prosecutor was explaining that she believed the jury would hear evidence that Zeigler left on A.V.'s cheek a bite mark that was identifiable as his. Dr. Lipton, the forensic dentist, described Zeigler's teeth as "distinctive," which he testified meant "not one of a kind, but pretty different from the majority." (Doc. 10-7, Ex. 1o, pp. 887-88.) Based on comparisons he made between Zeigler's bite impressions and a photograph of A.V.'s cheek, Dr. Lipton concluded that Zeigler was the "probable, more likely than not, cause of the

bite mark." (*Id.*, p. 895.) The parties stipulated that both Marshall and Vasquez were "excluded as being contributors of the bite mark." (Doc. 10-7, Ex. 1p, p. 1007.)

Zeigler fails to show that the prosecutor's reference to the bite mark as Zeigler's "signature" so infected the trial as to make his conviction a violation of due process. *See Darden*, 477 U.S. at 181. Thus, he does not show that counsel was ineffective for failing to object to this statement. Zeigler does not show that the state court's decision involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination. He is not entitled to relief on Ground Three, Subclaim Three.

### 4. Failure to Stipulate

Zeigler contends that trial counsel was ineffective for failing to enter into a stipulation about A.V.'s injuries. He asserts that the stipulation "would be consistent with the State's autopsy findings and expert medical testimony of the manner of death" and thus would have obviated the need to publish to the jury "gruesome and inflammatory" autopsy photographs. (Doc. 1, p. 9.) Zeigler argued in his postconviction motion that the photographs would not have been necessary had counsel "stipulate[d] that [A.V.'s] multiple injuries were caused by an unknown assailant within six to nine hours of her death" but did not occur from resuscitation efforts. (Doc. 28-9, Ex. 6, p. 14.) He contends that the photographs were inflammatory and unduly prejudicial because he was a "black male

accused of killing a two-year-old baby white girl tried in front of an all white jury." (Doc. 1, p. 9.)

The State filed a response to Zeigler's postconviction motion. The response provides that the State "was not prepared to accept a stipulation to the injuries in the instant case." (Doc. 28-9, Ex. 6, p. 40.) In the response, the State asserted that it needed to show the "obvious and apparent nature of the injuries, as well as the extent of the injuries," to establish that if they had occurred earlier, both Marshall and Zeigler would have observed them when A.V. returned home the afternoon of her death. (*Id.*, pp. 40-41.) Thus, the State asserted, Zeigler would have known she was injured and would have used a different description when he called 911 and said there was a "sick baby." (*Id.*, p. 41.)

Relying on the State's response, the state court noted that the State "indicates that it had no intention of stipulating to the victim's injuries . . . ." (Doc. 28-9, Ex. 6, p. 126.) Therefore, the state court found, even if counsel had offered to stipulate to the matters identified by Zeigler, "the effort would have been fruitless." (*Id.*) The state court noted that Florida law requires parties to agree to a stipulation and prevents a court from requiring a party to accept an offer to stipulate. (*Id.*) (citing *McGoey v. State*, 736 So.2d 31 (Fla. 3d DCA 1999) and *Arrington v. State*, 233 So.2d 634, 637 (Fla. 1970)). The state court also noted that counsel successfully moved to exclude some photographs. (*Id.*) The state court found that, under these circumstances, counsel was not ineffective. (*Id.*)

37

Zeigler does not show that the state court's denial was unreasonable. As the state court's order suggests, the State and defense presented significantly different theories about when A.V.'s injuries were inflicted. Zeigler cannot show a reasonable probability that the State would have agreed to a stipulation that put A.V.'s injuries considerably earlier than the timeline upon which the State's case relied. Additionally, Dr. Thogmartin used these photographs in his comprehensive testimony about A.V.'s injuries. His testimony supported the State's theory that the injuries occurred shortly before death. Thus, Zeigler he does not show a reasonable probability that the State would have accepted this stipulation—which its response indicated it would not do.

Additionally, the stipulation proposed by Zeigler in his postconviction motion was inconsistent with the defense theory that the injuries likely happened on or before February 8, 2004. And there is no indication in the record that the State ever offered such a stipulation and that defense counsel declined to accept it. Zeigler does not establish that counsel was ineffective for not stipulating regarding A.V.'s injuries. Zeigler does not show that the state court's decision involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination. He is not entitled to relief on Ground Three, Subclaim Four.

## V.  <u>CERTIFICATE OF APPEALABILITY</u>

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Instead, a district court or court of appeals must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a COA, Zeigler must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Zeigler has not made the requisite showing. Finally, because Zeigler is not entitled to a COA, he is not entitled to appeal in forma pauperis.

It is therefore **ORDERED** that Zeigler's Petition for Writ of Habeas Corpus, (Doc. 1), is **DENIED**. The **CLERK** is directed to enter judgment against Zeigler and in Respondent's favor and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on September 22, 2023.

*Kathryn Kimball Mizelle*

Kathryn Kimball Mizelle
United States District Judge

39